Day, OHA Investment Corporation v. Schlumberger Technology Corporation. Let's wait just a minute and let everyone get settled. Okay, Mr. Cadden. May it please the Court. Benjamin Cadden. I'm here today on behalf of a group of companies that provided critical goods, services and materials to ATP Oil & Gas prior to its filing bankruptcy. These goods were provided in connection with exploration of properties off the coast of Louisiana, and therefore the law of the State of Louisiana will control any decision in this Court. The lower Court's decision misapplied and contained internal inconsistencies with respect to the treatment of a term overriding royalty interest and how the sale of such a term overriding royalty following the inception of the statutory encumbrance would have an impact upon their interests. This strain reading not only disregarded Louisiana property and mineral law, but it created a framework, a construct, in which my clients as service providers are unable to protect their statutorily afforded lien rights with respect to a term override sold after the inception date of their liens. To be clear, this is not a case in which the appellants seek to impose in personam or personal liability upon the holder of a term overriding royalty interest. Instead, this is a case in which a term overriding royalty holder acquired an encumbered interest. It all comes down to notice, doesn't it? It absolutely comes down to notice, Your Honor. So tell us what the record is going to show us as to notice. Your Honor, the record will show you as to notice that these claimants did not provide direct notice to the term overriding royalty holders via letter or otherwise because there is an impossibility for our clients to ever comply with that notice requirement. If you take a look at the safe harbor provision, which is the basis by which the purchaser of the override got to get out of jail free card, that provision is aimed at purchasers of discrete quantities of hydrocarbons. As this Court is well aware, hydrocarbons are in the ground, they're extracted, and typically on a rolling or monthly basis are sold at a marketing and sale contract. In that context, my clients, to the extent we wish to seek to enforce our lien rights with respect to a purchaser, would provide notice to that purchaser. We would look up in the records who's buying this oil and gas. We would send them a notice. But with respect to a term overriding royalty holder who pays 100 percent of its purchase price at the time of the acquisition of the override, I'm sorry, it's impossible for us to know the transaction is going to occur and to send them notice because this is a private transaction between the operator on the one hand and a term overriding royalty purchaser on the other hand. So what case law do you point to that excuses notice under these circumstances? Your Honor, frankly, there is no case law directly on point. This is a new and novel issue. This is the first time that we are aware of any instance in which the holder of an overriding royalty has seeked to avail itself of the third-party bona fide purchaser exception. Again, the purpose of that notice provision is to protect a third-party purchaser who is buying production each month. They need the safety and the assurance that if they buy production this month and they tender the purchase price, that they're protected. However, if I provide notice to them, from that point forward, they're required to suspend payment. That does not work for somebody who pays 100 percent of their purchase price up front for a purchase of future production. How would we write this? Assume that we agree with you as to the result or we decide that we want to reach your result because it seems fair. So how would we write that in a published opinion? Would we just say that Louisiana law doesn't apply here as to the notice requirement? What would we say? What we would say, Your Honor, is that, or what you would say, Your Honors, is that this safe harbor provision and the scope of that provision, when it speaks to the purchaser of a hydrocarbon which was severed or is owned at severance, does not apply to the purchase of a term overriding royalty interest. It's important to understand that under Louisiana law, the operator in this instance, ATP, did not own hydrocarbons in the ground at the time it confected the sale of the override. What it sold to OHA was a term overriding royalty interest. That is a mineral interest which is treated as immovable or real property. That's very different than the purchaser of hydrocarbons. Hydrocarbons as severed, and if you read the notice provision of the safe harbor, it specifically referenced severed or owned at severance in the past tense because the Louisiana legislature knew and understood that prior to severance, they couldn't sell the hydrocarbons. The hydrocarbons are movables and are sold in discrete quantities when they're The decision isn't about whether we provided them notice. They are not a purchaser as contemplated by the safe harbor provision. And so that is the focus of what we believe the opinion should say. The provision that I'm looking at, that 1A under 4869, it doesn't say anything about severance of the hydrocarbon. It just says hydrocarbons, sold or otherwise transferred. And the usual real privilege doesn't apply if the transferee of the override pays before he's notified of the provider's rights. I would answer that for two reasons, Your Honor. First, hydrocarbons cannot be sold until they're severed because Louisiana law is explicit that ownership does not arise until severance. ATP doesn't own and therefore cannot sell what it doesn't own until severance. The second point, though, is equally important, which is Louisiana law, what do people get when they buy overrides in maybe the well isn't drilled yet? All they receive, to your point, Your Honor, all they receive is a right to participate in future production and the related proceeds. There is a likelihood that no production ever Well, and the other point I do want to make, Your Honor, is in the statute that you just read. I believe the most important part of that provision says that it was bought and sold by a lessee who severed or owned them at severance. This entire provision is written in the past tense because of what I just explained, which is that hydrocarbons can't be sold until severed, which is why this is written as something that happens on a rolling and contemporaneous basis as they are severed from the ground. And again, I do want to focus heavily on the impossibility of the notice provision. Well, I get you, but technically speaking, the overriding royalty interest may be an interest in realty, but what they get once severed is not realty. It's the hydrocarbons. Actually, Your Honor, in this case, they weren't entitled to take the hydrocarbons in kind. All they were entitled to was a royalty percentage based upon ATP severing and selling the hydrocarbons pursuant to marketing and sale contracts, which are in the record and attached to OHA's transaction documents. They get a right to proceeds from severed hydrocarbons. Correct, but they didn't buy the hydrocarbons themselves. Those were severed and sold by ATP to Shell or Plains Marketing or another purchaser who bought a discrete quantity of the hydrocarbons. OHA did not buy hydrocarbons. What they bought was a right to participate in future production of hydrocarbons, and that's a real right as opposed to a personal right. And this provision would be rendered pointless. We would have no ability to ever comply with the notice requirements. To Judge Smith's point, we didn't provide OHA notice because ATP and OHA negotiated this transaction without notice to the service providers who were the ones out in the field actually making sure that something came out of the ground. The best and only way I can fathom for my clients to protect our interests is for us to go out and file basically anticipatory liens from the first date that we start providing service. And it says, guess what, the law of Louisiana is that our lien incepts from the first date of service, and if you buy an interest in this property, you take it I think, Your Honors, if you think about this interest similar to a mortgage, OHA specifically worked with ATP to obtain a subordination of the pre-existing mortgage encumbrances when they bought their override. They didn't do that with us. They could have approached the debtors as part of due diligence on a $65 million purchase and said, we know this relation back doctrine. We may be primed if you ever stop paying people who were working before we bought our override. We need to know who those vendors are because we can then approach those vendors and say, we're buying this override. Will you agree to a subordination? Maybe you don't buy it. Maybe they won't agree. I would venture to guess the OHAs of the world, the operators, the holders of mineral interests would be very uncomfortable with the record being littered, the title being littered with anticipatory notices of liens. Let me go back to that section that I was looking at. Doesn't it say that the privilege doesn't apply for its extinguished? Whether or not the person who is the owner of the property, who sold it, did so before or after severance becomes ineffective to a third person if the manner, well, I'm at the wrong one. I'm at the wrong section, 1A. Transaction, bona fide transaction, who severed or owned them at severance, if the, so before or after severance. The conveyance to the override before or after severance is, does not have to recognize that privilege unless notified before, required the interest. Well, two points, Your Honor. First, I would respectfully disagree. I think that the past tense is clear in that it only applies for hydrocarbons that were sold at severance. And that ties into the fact, again, hydrocarbons aren't owned by ATP prior to severance. You cannot sell something before severance because you don't own it. All you're selling is a derivative interest of your right as the landowner or lessee to explore, extract, and then upon extraction own the hydrocarbons. And that is exactly why I believe it's written in the licensees who are going to sever or will sever in the future. But they were very intentional and it actually interplays perfectly with the Louisiana Mineral Code. The other issue, Your Honor, I would like to briefly touch on because I know it was a focus of OHA's briefs, is the concept that this appeal is somehow precluded by a race judicata doctrine. As this Court may be well aware, this adversary proceeding involved a great number of parties, some of whom are in the Court today, and it was bifurcated into two phases. The first phase was a phase in which there was a dispute between OHA and ATP as to whether this transaction was even a sale of a real right or was really just a disguise financing. That was coined and actually specifically defined as the financing issues. The second part of the litigation was focused upon the issues of whether the overriding royalty interests were bought, assuming that it was a true sale, subject to the rights of our clients. Phase one's final judgment, they like to use it as a sword, but in fact I believe that final judgment actually supports the arguments of appellants. Because as I've tried to explain to the Court, the fact that hydrocarbons are distinguishable types of property under Louisiana property law is recognized in this final judgment, which says the term overrides are a real interest in property and in the state of Louisiana are an immovable property interest and a real right. That in and of itself is a reflection of the understanding of the parties that what they acquired was immovable or a real right. What they did not acquire were hydrocarbons. And so to afford them the protection of this third party purchaser statute essentially eviscerates the ability of my clients to protect our rights vis-a-vis an operating interest. Take, for example, a company like ATP, who is extremely strained for liquidity. They know that their property interest is encumbered by statutory liens because they're not paying their vendors. They know that if they produce oil and gas, I as the lien claimant can provide notice to the plains marketing of the world and that person has to suspend payment. So what they do is they monetize that encumbered interest by selling a term override. They now get the cash in. That cash then immediately goes out the door. And I'm left without any remedy because I can't know. I'm sorry, Your Honor. You're telling me that the section says that nothing is transferred of hydrocarbons before severance. I think that's exactly what the section says, Your Honor. What is transferred is that- So the effect of this language right here is that you don't sever ownership in hydrocarbons or what you're buying with an override, whatever you call it. What you're buying with the- Before severance. Before severance. All you're buying with the override is a right to a future- And so that's not a transfer under this section? No, Your Honor. That is not a transfer of hydrocarbons. It doesn't say the privilege is extinguished, sold, or transferred by a person before or after severance. It absolutely does not say that, Your Honor. It doesn't say that? No, sir. All right. Thank you. Okay. The overriding royalty interest has a right to proceeds once a sale of hydrocarbons occurs. Correct. So this statute, it seems to me, would apply, but it applies to the purchasers of the hydrocarbons and not the proceeds. In other words, it does apply to the proceeds because the purchasers are the people who bought it, not the overriding royalty interest owners. What the statute applies to is somebody who buys a discrete quantity of hydrocarbons at the wellhead when they're severed and brought to market. And it would seem to me that's not the overriding royalty interest owner. That's the person who buys the hydrocarbons at the wellhead. That's precisely correct, Your Honor. And if they have notice, they've got to pay, hold a portion of the proceeds. Correct. They can't transfer the proceeds to anybody, including the overriding royalty interest owner.  notice. And they would suspend. That framework doesn't work for somebody who pays 100 percent up front for production that may or may not occur and will happen years later. That's not what I understand overriding royalty interest to be. They're not paying 100 percent for production. They're paying for a right to proceeds, right? That is correct, Your Honor. Which is different. Correct. They're not purchasing hydrocarbons. They're purchasing a right to proceeds in the future. I see my time is up. I should save my time for rebuttal. Yes, you've saved time for rebuttal, Mr. Kedem. Thank you. Thank you, Your Honor. Thank you. Mr. Hancock. Thank you, Your Honors. Ty Hancock. May it please the Court. Good morning. And I represent OHA Investment Corporation. In this matter, as appellee and cross-appellant, Your Honor, OHA requests that this Court affirm the decisions of the lower courts and deny the relief requested by the lien claimants in all respects. And the reason, in short, is that LOLA, Louisiana Oil Well Lien Act, permits sales of hydrocarbons, including shares of hydrocarbons, in arm's-length bona fide transactions during lease operations. OHA's production payment, also known as a term overriding royalty interest, is a share of hydrocarbon production. It's a cost-free share of hydrocarbon production. And what the lien claimants are arguing under the statute is, effectively, to treat it, under the statute, as if it's a sale of an operating interest, and thereby impose, without notice, their liens for the cost of operations on a cost-free share of production. And, Your Honors, that's not what the statute allows. It's contrary to the language of the statute, and it's contrary to the nature of the interest and the notice requirement. Your Honor was asking about specifically notice, and we agree that that's a fundamental issue in this case. And from a big-picture standpoint, what the Louisiana legislature is saying under this statute is that, if you're going to buy a share of production that's cost-free and not an operating interest, whether it's pre-severance or post-severance, then you're not going to be responsible for operating costs, because those are costs borne by the lessees as owners of the operating interest, unless you receive notice of the claim, of the existence of the lien. And that's really the fundamental distinction under this statute, and it's driven by the nature of the interest involved. What Mr. Cadden tells us is that it's impossible for them to comply with the notice requirement. Will you address that specifically? Absolutely, Your Honor. The lien claimants can enforce their liens. They can file notices in the public records, giving notice that they are asserting a lien against the interest under the statute, against the property described in the statute. That is an affirmative act that is directed, potentially, at hydrocarbon purchasers, pre-severance hydrocarbon purchasers, that a lien is being asserted against the property. Now, the statute says that when a purchaser of a production payment pays the purchase price, as long as that purchase price is paid before being notified of the privilege by the claimant, then the share of hydrocarbons sold is extinguished. But the requirement of the statute that it be a bona fide transaction also assumes that we paid for the hydrocarbons we purchased. In this case, we paid $65 million for the hydrocarbons that we purchased. And the terms of the statute provide that the alleged liens of the lien claimants attach to those proceeds. So conceptually, the statute absolutely protects the rights of the lien claimants because their collateral package, if you will, under the terms of the statute, which they're strictly subject to, is not being diminished in any way. And the statute contemplates that they are protected because of the safe harbor provision and the requirement for it to be a bona fide onerous transaction. And when it comes time to enforce their lien, what they can do is actually enforce it. File notice and start proceeding to file a lawsuit and enforce the lien against the lessee. Identify any proceeds of production in the hands of the lessee. And where would the notice be filed? In the applicable mortgage records of the, in this case, in Louisiana, in the applicable records of the county. Well, I mean, would it be in multiple parishes or one parish, or where would it be filed? Be in the parishes adjacent to where the property is located. That's because of OSHA? I mean, the Addercott and Hill Shelf Lands Act? Lands Act, correct. And, you know, what's fundamental to the lower court's decisions here was the nature of this interest. And in Louisiana, and there's an overlaying issue of 541b4b, but we don't believe there's any conflict in this case with 541, because Louisiana allows for a pre-severance sale of hydrocarbon production. We have cited this LOLA itself, which discusses hydrocarbon ownership by non-lessees under section 4863c1, where it discusses the fact that privileges can't affect hydrocarbons owned by non-lessees. It contemplates that the non-lessee interest owner owns the hydrocarbons. That implicitly also recognized that that share of hydrocarbons can be sold pre-severance. And we've also cited Commissioner v. Gray, Continental Oil v. Landry, as well as the Williams and Myers Oil and Gas Treatise, and all of those support the proposition that when you purchase a term overriding royalty, it's a share of the hydrocarbons produced. Now, you can negotiate terms regarding how the deal is affected. If you buy a share of hydrocarbons, you can buy them in kind. You can buy a volumetric production payment, where you're actually taking in kind and receiving a certain amount of the hydrocarbon molecules. Or you can buy a share of hydrocarbons that obligates the lessee to transport those hydrocarbons and sell them on your behalf, and then remit the proceeds. But the fact that you agree to allow the lessee to transport them doesn't mean you still own the hydrocarbons that are being transferred. And that's our fundamental point here, is that as a matter of law, we owned our proportionate share of the hydrocarbons. And Louisiana allows those hydrocarbons to be transferred pre-extraction. And so when we think about the terms of the lien statute, it's important, I think, to put it all in context. Because where it discusses what liens are granted under Section 4863, it speaks in terms of the operating interest and then production from the operating interest. And that production can be owned by lessees. It can be owned by other non-lessee interest holders. But all of that production can be sold under the safe harbor. And that's the way the statute operates. And when you look at the language of the safe harbor, and I provided a handout to the Court, but it seems that you all have a copy of the safe harbor language in front of you under Section 4869, it's important to note that the liens that are extinguished under the safe harbor are the liens to production from the operating interest and proceeds for production in the operating interest. And the lien under A1, which is granted against the operating interest, is not extinguished. And so, you know, a couple of important points there. One, you cannot sell an operating interest free and clear of these liens. It's subject to the liens. It's not part of the safe harbor provision. But you can sell shares of production free and clear, and you have to conclude logically that the lien under A1 is not granted against hydrocarbons and hydrocarbon production, because otherwise the safe harbor would be meaningless. You'd never be able to sell hydrocarbons free and clear because the A1 lien isn't extinguished. So it helps, I think, in terms of construing the statute to understand the breadth of it in that it addresses all hydrocarbons that are produced from the operating interest. And the language of the statute, the breadth of it, I think, continues to make that concept clear. The court noticed the language sold or otherwise transferred. We think that otherwise transferred is important, because it recognizes that hydrocarbons can be transferred in different ways. They can be transferred under Louisiana law pre-extraction, or they can be transferred post-extraction, post-severance. And the otherwise transferred is important to capture that. They can be transferred by the lessee, which is a defined term. That's a person who owns an operating interest. And that's the person that can sell a pre-extraction share of production. Or other person who severed or owned them at severance. So when you look at the other transferred language and you think about it under the construction of the statute with the following language, we think it's very clear that this is intended to apply broadly to all shares of hydrocarbon production. And all that is required under the statute is that the transferee pay for those hydrocarbons before he's notified of the privilege by the state. The importance of the notice provision is that, again, it centers around the nature of these interests. A purchaser of a non-cost-bearing share of production isn't involved in operations. They don't have any ability to identify lien claimants that are performing services that have been paid or not been paid. And one of the amazing runoffs of the lien claimants interpretation of the statute, and the reason why the concept of strict liability is kind of analogous, is that under their interpretation of the statute, the way the statute works, there's no disagreement on this, that a lien incepts against the property identified in the statute on the date of first work. And so conceptually, it can continue in perpetuity as long as there's not a lapse in services of more than 90 days. So under the lien claimant's interpretation of the statute, a purchaser of a production payment can buy in year one when they are performing services and can receive a share of hydrocarbons for years into the future until they don't get paid. Any point in the future, if they don't get paid and there hasn't been a lapse of 90 days, their theory is that their lien can relate back and can capture or assert a claim against all those hydrocarbons that were received by the purchaser. And, Your Honors, we very strongly believe that that is not the interpretation of the statute. That's not how it should be read. Maybe this is too simplistic. I'm just trying to think through this. Let's assume I'm an interstate pipeline and I decide to purchase this gas from the operator and it's subject to the overriding royalty interest, and I have notice, then why isn't that notice, why isn't the purchaser obligated to hold the proceeds for everybody? I mean, on behalf of the M&M lien claimants, for everybody, even as against the overriding royalty interest owner, since it's a proceeds situation? I think I understand your question, Your Honor. So if there's a particular purchaser of severed hydrocarbons under a marketing agreement, as lien claimants describe it, and they receive notice of a potential lien, then they wouldn't pay those proceeds to the operator. But that doesn't mean that the lien claimant has a lien on all of those proceeds. Because what the purchaser of the production payment would say is that those proceeds of production are not property of the lessee. Your lien does not attach to production proceeds that the lessee doesn't have an interest in. So there are issues there that would need to be resolved. But conceptually, just because they serve notice of a lien on a purchaser of severed hydrocarbons certainly does not mean under the statute that their lien attaches to all of those proceeds. Does that answer your question, Your Honor? I need to think through it, I suppose. But if the interest is truly only a right to be paid out of proceeds, it seems to me that there's a lien on the gas and on the hydrocarbons as they're sold to Interstate Pipeline. Interstate Pipeline has to hold a percentage of those proceeds, as against everybody. I would agree with that, Your Honor, if all it is. If all it is is an interest in proceeds, then I think that logic is correct. But it's not. And that's our fundamental point, is that when you sell a share of production, what you're doing is you're selling a share of the hydrocarbons. And that concept, I think, under Louisiana law, is clear under Commissioner v. Gray, Continental Oil v. Landry, the Williams and Myers Treatise, and under the statute itself when it refers to ownership. Now let me touch on the point of 541B4B. What the bankruptcy code says, if you buy a production payment, and if it's a qualifying production payment under 541B4B, then the hydrocarbons in issue are sold. They are owned by the purchaser. They are not owned by the seller. And that is to clarify property rights in the event of a bankruptcy. Again, we don't think there's a conflict here between Louisiana law because of the cases we've cited and because of the language of the statute. If there was a conflict, we do have a final judgment that says we purchased a qualifying production payment, and we own those hydrocarbons. So from our perspective, the ownership issue, which really touches on the proceeds question, is a moot. It's resolved. And the LEND claimants have admitted here that they're bound by that judgment, have admitted in front of the district court that they're bound by the judgment. And so that issue is settled from our perspective. Other part of the notice language that is important, I think, that is supported by cases that are even cited by the LEND claimants, like Guchard, is that the notification provision keeps the risk on the lessees, the parties that operate the properties, the parties that hire and fire contractors. If you require notification to be served on the purchaser of hydrocarbons in order for the lien not to be extinguished, what you're saying is the lessee is going to bear the risk of these operations, and we're not going to transfer that risk to a purchaser of a share of hydrocarbons under the statute. And I think that is, we agree with certainly that proposition as set forth in Guchard, and I think that's how the statute ought to be interpreted. I guess I would make one quick point on our cross-appeal, if the court doesn't have further questions on the safe harbor. And it is, of course, we cross-appeal on the basis that if this court somehow, for whatever reason, disagrees with the decisions of the lower courts that production payments are subject to the safe harbor protections, then we would in the alternative believe that just looking at the other language of the statute and what these privileges can affect, that non-cost-bearing interests are protected under the terms of the statute. And back to my point regarding the safe harbor, is that the lien granted under 4863A1 does not include hydrocarbons or hydrocarbon production. We believe logically that has to be the case in order for the safe harbor to make sense. And so when a purchaser of a share of hydrocarbons buys a term overriding royalty, for example, then it legally is the owner of those hydrocarbons at severance. And on that basis, the language in lien statute doesn't purport to affect or attach to hydrocarbons owned by royalty owners. Under 4863C1, the hydrocarbons owned by non-lesses is specifically carved out, but the other provisions that specify the property to which the lien attaches, it also doesn't expressly capture the property hydrocarbons that are sold pre-extraction to a purchaser of production. And I just would make that one point in connection with the cross-example. You know, Your Honors, the ownership theories, these ownership theories have been thrown around, I see my time is running down, as a basis for saying that hydrocarbons in Louisiana can't be sold pre-extraction and that's wrong, that's fundamentally wrong. And I'd like to explain that a little bit. In Texas, it's an ownership in place state, but it's subject to the rule of capture. And in Texas, you can sell a share of hydrocarbon production just like you can in Louisiana. Louisiana's ownership theory is a rule of capture. In application, it's very similar to the law of Texas that relates to the sale of hydrocarbons. The fact that you can't absolutely own hydrocarbons in the ground does not prevent LSC, who has the exclusive right to explore and produce, from selling a share of hydrocarbon production. And we believe that the cases that I had just recently cited, the Landry Oil and Continental cases, as well as the statute, support that. Your Honors, I will ask to be excused unless you have further questions. Thank you, Mr. Hancock. Mr. Cadden, you've saved time for rebuttal. Your Honors, OHA's entire theory on this case is premised upon their ability to acquire and purchase hydrocarbons pre-severance. I thought it would be instructive to bring and unfortunately read to your Honors the Mineral Code, which is what actually defines property interest in Louisiana. LOLA, Louisiana Oil and Lean Act, doesn't define what's property interest. 541B, which relates to property of the estate, doesn't define property interest. 31-6, the Louisiana Mineral Code, says specifically, ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid and gaseous form. And it continues, the landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership. Ownership does not arise. Mr. Hancock then made the statement, as I wrote it down, quote, hydrocarbons in Louisiana can be sold pre-extraction. Are you telling us that that is not the case? That is legally incorrect. Hydrocarbons cannot be sold pre-extraction because they cannot be owned pre-extraction. What can be sold pre-extraction is the operating interest can sell a derivative portion of its right to explore and own upon severance in the future. They cannot sell hydrocarbons to them pre-extraction because they do not own them. And again, I also want to make sure that we talked about the ability to file a notice. What Mr. Hancock has referred to earlier about we could go and we could file a notice of our lien in all the various parish and mortgage records. I believe it was the Supreme Contractors v. Halliburton which said the statute shouldn't be read to impose an inestimable burden upon the lien claimants. Well, when you are talking about this much money, that is not such a burden. It would be a few parishes, wouldn't it? Well, Your Honor, what you are talking about though in a given oil and gas operation could be tens or dozens or hundreds of vendors who may only be earning $1,000, $10,000, $20,000. So for them to each, at the inception of providing services, go out and file a lien that says in case one day I may not be paid, I have a lien that starts as of this date, would absolutely drown the mortgage records offices, particularly in oil producing parishes, with unnecessary documents that really do nothing more than recite the law. The fact of the matter is that that notice provision is intended for people who are buying discrete quantities from the wellhead on a rolling basis and it captures production from that point forward. If the Court has no further questions, I thank you for your time.